Good morning. Please proceed. We are here to hear an argument in the case of Redding v. Stafford Unified School District. Counsel, ready to go? You may proceed. Oh, good morning, Judge Gould. How are you? Good morning. I'm fine, thanks. You see Judge Gould is appearing by radio from Seattle. Good morning, Your Honors. I'm Andrew Peterson. I'm here representing Savannah and April Redding. A strip search is the most intrusive search, and intrusiveness matters. Well, actually, no. There are body cavity searches. Which is a strip search. No, it's a body cavity search. I mean, in a sense, all searches are searches, but a search, there's also visual inspection of the private parts, which is a more intrusive search than a strip search. So it is not the most intrusive search. And I think most people would think there is a big difference between what happened to your client here and what happens to many people at the border when they're asked to. Well, the strip search here was not what happens at the border. No, I understand, but it is not the most intrusive search. It is an intrusive search, but it's certainly not the most intrusive search. I'd like to reframe it as it's a highly intrusive search. Maybe you won't get as much black that way. Okay, a highly intrusive search versus the most intrusive search. I'm kind of wasting time over this. Disconceited. But this Court has recognized that they are. It's important to recognize that there are many more steps, several more steps the school authorities could have gone beyond what they did. Not much farther, other than the body cavity search. Well, there was visual inspection of the oral cavities, I mean, of the body cavities. They could have asked to look down her throat. They could have asked her to take off her panties and bend over and, well, you know the drill, and do a visual inspection. And they could have done a body cavity search. So those are all steps more intrusive than what happened here. But this Court has recognized, even in cases involving arrestees, the intrusiveness of a strip search, whether or not they're going to do a body cavity search. Let me ask you a question. What case clearly establishes that this search was improper? I think we go back to Bilbrey v. Brown. What year was that? That was before TLO. And in that case, it involved a 5-year-old student who they thought were hiding something. The bus driver thought they were selling drugs out on the playground. The Court looked at that very closely. The Court considered whether the probable cause standard applied or whether the reasonable suspicion standard applied, and held that under either, the search was unconstitutional. You have to have more to justify an intrusive search. Then comes TLO. Then comes TLO. And then we've got cases from other jurisdictions. I mean, TLO was emphasized that intrusiveness really does matter. Okay. TLO was not a strip search case. No, not at all. But in that case, remember the COVID- What's your best strip search case? Well, I think in this circuit, we start with Bilbrey v. Brown. The cases, the Williams case, for instance, shows us what could have been done but wasn't done in this case. The Williams case says, you know, they do this whole week-long investigation. They talk to the student's parents. They talk- In Williams, the search was upheld. Yes, it was. What's your best case that strikes down the strip search? The Faneuve case. Okay. But that was after, that was several years after the search in our case. Correct. So what clearly establishes as of the date of the search that this search was unconstitutional? I think Bilbrey does, and I think TLO does. Because in both those instances, the court's saying you have to consider the expectations of privacy. And in terms of- TLO was not a strip search case. No, it was a purse case. But in that case, the court was very careful to go through the process of what was done. This girl was caught with cigarettes. They take her into the office. I mean, there was really two searches there. They initially looked in her purse. Looking in her purse led to seeing the marijuana wrappers, which led to a further investigation. In other words, there was a building, building up, and the court said that that was reasonable under the circumstances. Here, they jumped right into the strip search. They get an uncorroborated tip from another student who was in trouble. Well, actually, they searched her backpack first and found nothing. So that would make what they did next even more unreasonable, because unlike in TLO, which took an incremental approach, they first just searched the inside of the purse. And it was only after they found the marijuana wrappers that the school administrators unzipped the pocket of the purse. But that had to be justified as well. Right. And here there was nothing. From the moment they brought Savannah into the vice principal's office and started asking her questions, they gained nothing. There was nothing there to corroborate anything that Marissa said. I want to follow up on Judge Silverman's question. Do you agree that the record before us is sufficient to decide the issue of clearly established? I noticed the magistrate judge did not reach that issue. Correct. I think it is. There is enough record for this Court to find the law was clearly established. Schools should know better than to do this. And if they're going to do a strip search, they have to have good reason. They have to have a quantum of evidence. They have to have quality evidence that tells them that they're going to find what they're looking for, where they're looking for it. Nothing here gave them any indication that Savannah was hiding pills in her bra or panties. Nothing. Could I ask a clarifying question? Yes, sir. There's a two-step analysis under TOL. One is the inception, and then you go, if there is a reasonable suspicious at the inception, then you shade over into the nature of the search. Now, you started off by talking about the latter. Are you willing to concede, or do you concede, that there was enough information from Marissa, tied in with what Jordan had said, to at least do some kind of searches to determine whether Savannah had pills, be it in her backpack or the like? Sure. Okay. So at the inception, there was enough suspicion that she might have had pills somewhere. Correct. But I think my next question then is, if so, and given the nature of the object, okay, it's well known that drug couriers of people trying to conceal drugs do them in underquilts. Okay. So assuming they had enough information to search for pills, what is your argument as to why that doesn't extend to going beyond her backpack or purse and then getting them to places where they might otherwise be concealed? I think we have to be very careful on that first prong, what justified at inception means. It doesn't mean, and I don't think anyone would argue that once you have a suspicion that they have something, that that justifies a strip search, whether it's bubblegum or something else. A strip search. So you have to. Judge Kaczynski's point is well taken to the extent it suggests that a true strip search would be to strip somebody naked. All right. Now, what they did here was to pull her bra out and to have her panties out. The alternative would be a pat-down search, presumably so that her body parts weren't exposed, but that then involves placing hands on the body. So assuming that they're looking for pills that may be concealed, what are the options open to them to carry out a less intrusive search? All right. I don't want to concede that they're justified at inception to do a strip search here. Fine. Okay. I'm just asking. There are less intrusive means, but to do a strip search based on what Marissa said was wholly unreasonable, because they had nothing. But they said that they had enough to go on to search her backpack. Okay. So I'm trying to understand. There's a big difference between the backpack and the strip search. I know that. And so they may have, if you're doing the balancing test, which has to be closed. Is it your position in answering Judge Fischer's question, and I do want to keep you to keep his question in mind, that when they don't find the pills in the backpack, I guess she didn't have pockets here, but let's say they ask her to turn out her pockets, and that doesn't yield a search. They have to give up and say, sorry, you can go back to class. Is that? They should have given. I think that's what Judge Fischer is asking. I apologize. Is that your position? Well, no. I think at some point in time they got to. What do they do? I think that's what Judge Fischer is asking. What do they do? They have information that seems pretty solid from other students that this student is involved in distributing pills. They look in the nonintrusive places like backpack, her outer clothing and the like, and don't find it. And at that point, they do what? Stop. Isn't the problem that they didn't have adequate information from other students? Don't you argue in your brief that you, that the informant was not reliable? Correct. And they did nothing to corroborate. They did nothing to substantiate what she said. I thought you just told Judge Fischer that they had sufficient reasonable suspicion to search her purse, her backpack. Correct. I mean, that's, they're justified to take certain steps. They're justified in doing a national investigation. The information was sufficiently reliable in your mind to search her backpack. Because you've got to weigh the balance. Could I have a yes or no? Could I have a yes or no? She is, there's enough there to search the backpack. Our question is, did they have sufficient cause to search her backpack? Yes. Could they have asked her to take off her shoes and shake them out? That's not overly intrusive, I don't believe. Take off her socks and shake them out? Well, then you're asking her to do something that there's no reason to go there. There's nothing that says that she's secreting pills anywhere. It's not like Kornfield where you've got this unusual bulge in the pants. Or you've got the Fulis case where they're talking about, you know, kids are saying they're hiding the marijuana in their butt crack. You know, there's nothing that tells this school that she's hiding pills in her bra or panties. Nothing. No evidence. And if you're going to do the balancing and weigh the intrusiveness of the search.  If she is said to have pills by a reliable source and the pills are not found in the obvious places, why isn't the inference then she might well have them in the non-obvious places like concealed in her body? Why isn't that a fair inference once you say you have sufficiently reliable information to search her backpack? Because it's the intrusiveness, again, of the search. When you're going to go take that next step to have them take off your clothes, you're going to have to have greater weight. Let's talk about intrusiveness. You know, I don't know. I don't want to be facetious here at all, but I don't know what happens in girls' locker rooms. But I assume the same thing happens in girls' locker rooms that happens in boys' locker rooms. Being the only female on this panel, I can assure you that's not so. I mean, do girls have to P.E., shower in their underwear and bra? Or they have stalls with doors. And how do they get there? Before we get to that, which is the second prong of TLO, I don't want you to give up on the first prong here. Right. Isn't the case that in TLO, the Supreme Court approved facts where when the investigating official found something, they were authorized to go to the next step. Correct. And when they found something there, they were authorized to go to the next step and so on. Correct. I'd like you to address the fact that in this particular case, Marissa said, and she's the only person that said, that Ms. Redding had pills. Jordan did not say that. Jordan accused Marissa. So you have one person who was caught who spilled the beans, so to speak, with this other person. But when they searched her backpack, they found nothing. Under TLO's first prong, what, if anything, does that mean in terms of our jurisprudence? I think what it means is that on page 337 of TLO, it talks about intrusiveness and expectation. What it means is that you've got to stop. You have to do further investigation. You have to do, like I said, what they did in the Williams v. Ellington case, talk to parents. I mean, call her mother. Talk to the parents. Talk to other students. Who are these other students that Jordan's supposedly saying are going to be taking pills at lunchtime? Where is that principle clearly established? What case clearly establishes the duty to call the mother? There's no ñ I mean, every case has its little nuanced facts. It's a reasonable step that's been taken. It was taken in FANUF. In FANUF, they actually ñ FANUF wasn't around in 2003. All right. Williams v. Ellington, they called ñ This is what I was trying to explore. Doesn't your answer have to be that along the lines you were pursuing, that you then go under the prong of less intrusive means? So less intrusive, you start looking to alternatives to opening up, having somebody take their clothes partially off or entirely off. What are the alternatives? So you have identified at least the alternative of having a parent come in. That's a matter of common sense, presumably. Talk to other students. Right. Talk to other students. But what else could have been done under the circumstances other than what you've already now articulated? I think the case is talking about a continuing investigation when they're suspecting a student of having some kind of contraband, whether it's contacting the school teachers, the teachers that were around the student at that time, to talking to other students, to talking to parents, to having an indicia from the student as to whether they're credible, whether they're a troublemaker. I mean, there's a lot of little factors out there. What would calling the mother have added to the quantum of information that would or would not establish reasonable suspicion? Well, the mother could explain, or they could talk to the mother. Wasn't the mother called earlier about an alcohol incident and denied her daughter's involvement? No. In our affidavit from Savannah Redding, she clarifies that when they went in to meet with Principal Beeman after this search, Principal Beeman brought up that incident. And Savannah's mother asked him, why didn't you tell me about it earlier? If this was an issue with you, why didn't you call me earlier? And he said he couldn't get a hold of her. His affidavit says something a little bit differently. I thought that was in connection with this search. No. No, that had to do with while they were in Savannah's affidavit, while they were meeting with Principal Beeman and discussing this incident with him, he brings up this so-called, you know, she's with the wrong crowd. And so Savannah's mother asked him, well, why didn't you tell me about that earlier? Or why didn't you, if this was going on, contact me? And he said he tried and he couldn't do it. But that's not what Mr. Beeman said. Mr. Beeman said that Savannah's mother simply dismissed the account by saying Savannah would not have been involved. That's what he said. It's a summary judgment. It is. It's a summary judgment, though, when you view the facts in a light-most bearable, even non-living private. But let me ask you something. The whole reason why school searches of anything versus backpacks, pockets, is permitted under TLO is because the school administrators have the right and obligation to protect other students from harms and danger. And I'm just wondering what is the particular harm that the school was trying to prevent in this case that it thought the strip search of Savannah would accomplish? What was it concerned about? Why was it searching Savannah? Well, I guess they're really concerned about ibuprofen, that this was going to be distributed at lunchtime. Afraid she was going to give it to another kid, right? Correct. So what are the other options that are reasonably available to them? Well, all they had, though, was the school could have done a lot of things if they believed that they have a drug problem in their school, education of the kids. There's a number of things you can do. How about that very day? That very day when they had Savannah. How about just putting her in the principal's office during lunch hour? They could have done that. Called her mother and said, come get your student. We're investigating an issue here. She shouldn't be in school. Come get her. And what would you have the mother do, the search? Is that why the mother was there? No. And actually, the Phaneuf case, they talk a little bit about that because they called the mother, and the mother actually comes to the school and participates in the search, and the court said that's unconstitutional because it's still overly intrusive. You've got these school officials who are directing the search, who are watching, and that's the issue that's raised by the amici briefs filed by the National Association of Social Workers and the Rutherford Institute is just how intrusive this is to an adolescent 13-year-old girl. What's the evidence with respect to her demeanor under questioning? Was there any suggestion that she was lying? Did they ask her if she was concealing it anywhere else on her body? There's nothing that they say. There's nothing that they say that her demeanor somehow led them to believe that she was hiding or secreting something. And that's also unlike some of the other strip search cases, like the Cornfield case where the kid's shouting obscenities, he's upset, to the Williams case where it appears that at one point the kids were under the influence of something. There was nothing in her demeanor and nothing she did when she was meeting with the vice principal that would cause them to believe that she's hiding pills. Is there any evidence that the school had ever found kids secreting drugs in their underwear? No. What about Marissa? Did they make any effort to search her further and look for any more evidence of pills on her? Yes. They strip searched her. They did. They did. And it seems like they subjected her to the same search as your client. Correct. Did they have a reasonable basis to do that? No. Not in my opinion, because even then they had no reason to believe that she was hiding the pills in her undergarments. All they had with Marissa was that she had some pills when they checked her pockets. Let me ask you a hypothetical. Suppose instead of pills, suppose the drug was cocaine. They find cocaine on Marissa. Marissa says, I got cocaine from Savannah. Would that be a different case? Would that change the result? I think, I'm not sure it changes the result, but I think it changes the balancing test. If you're looking at the quantum of evidence, what the nature of the infraction is, if it's cocaine or a drug like that. What could they have done differently if it had been cocaine? I think still the school should investigate. Investigate it further. Talk to other students. Talk to the kids. You know, if it's cocaine and Marissa had cocaine in her pocket, then you can get the police involved at that point in time. There's a number of things that can be done if it's a drug like that. And, you know, here the school knew all along that this was ibuprofen and nothing more than ibuprofen. Prescription strength. Correct. Are you disputing that ibuprofen can be abused by students? No, but it's not on the list, I think, of drugs that are used. I think the answer you gave is no. You don't dispute that it can be, so we can give an established that it can. Now, I'm a little puzzled by your answer about Marissa and your earlier answer about Savannah. You said they have no cause to strip search Marissa. Is that what you said? Well, because all they've said is correct. Did you say that? Okay. Can I explain? No. Okay. Go ahead. Certainly not. So your answer was they search Savannah, they find nothing, and that gives them no reason to strip search. They search Marissa, they do find something. That also gives them no reason to strip search. Is there anything that does give them a reason? If either finding nothing or finding something is no reason to strip search, is there ever, in your view, a reason to conduct the kind of search they conducted here? Marissa turned out her pockets, and I think that's something that they did. Just answer my question. You said your complaint about Savannah was they searched, they didn't do anything progressive, they didn't go to the next step because they didn't find something that justified going to the next step. And then you say, Marissa, they did find pills, but there was no indication that she had anything hidden. Right. So I don't understand. If either finding something or finding nothing, both are no justification for going further, when do you go further? Because there's nothing for them to go further with Marissa. There's no indication. There's no bulge in their pants. There's nothing telling them that she's secreting pills underneath her clothing. She's turned out her pockets, and that's something that school officials frequently do. That doesn't give them the license to do that. So do you actually have to see something that shows an outward indication that there's something hidden underneath? Well, that or some other corroboration. You know, even in Fanuf's case where the court said the search was unconstitutional, they had a student, an innocent, another innocent student coming into the school and saying, hey, this girl has marijuana, we're going to leave on this bus trip to catch her with cigarettes, and this girl says she's got marijuana and she's going to hide it down her pants so that she doesn't get caught. And there the court said it's still unconstitutional because they're not justified based on that informant in taking the steps of conducting the scripture. I'll give you a second. But it's a great case. I wonder if I could just change the subject just for a minute since we have so little time left. You've got the two nurses and you've got Principal Beaman, and then you've got Wilson, the vice principal. For purposes of if we assume by argumento that there is a constitutional violation here, let's talk about qualified immunity. Do you see a difference in terms of what clearly established law would show between the possible culpability that might remove qualified immunity from Wilson and the rest of the actors in this situation? Sure. He's the vice principal. If anyone's going to know what the law is and how far you can go with searching students, he should be the one. It seems to me like he directed the strip searches. He basically said to the administrative assistant, go have conducted a strip search of these kids. And the nurse sat there and went and watched. So, yes, he certainly has more culpability. Is there anything in the record that indicates that Vice Principal Wilson received any kind of training from the state or his school board or somebody with respect to this particular issue, that is, strip searching, what constitutional rights students had and so on? There's nothing in the record. Nothing in the record. And there's nothing in the record that even indicates why they believed Marissa, why they thought that for some reason she was reliable. There's nothing in the record. There's not even their search policy in the record. One other thing here. Both Beeman and Wilson's declarations are virtually identical in the first part. And in searching for information about the problem that the school had had, they said there's a problem. And then they go back to a period two years before when someone brought some prescription medicine and was given out and somebody got sick. That in and of itself does not seem to indicate that there was a very serious problem in this school with respect to prescription drugs. Is there anything in the record other than these declarations, the two declarations that addresses that issue? No. Was Savannah even at the school then? The first incident described in the two affidavits, it says years ago they had this problem with drugs. But Savannah at the school, I mean, she was only 13. What grade was she in? Middle school, right? Correct. So, I mean, again, how does that link Savannah to? It doesn't. It doesn't. And it's just a generalized statement. We've got a drug problem. We've had this incident years ago. Therefore, we were justified. In fact, they're trying to justify what they did here based on that. And that's no justification. That's not the specific articulated suspicion that's reasonable to conduct a prescription. I have a hard time understanding how you reconcile that with your answer to my earlier question where you said you don't dispute that ibuprofen, prescription drugs, ibuprofen can be abused by students. It seems to me once you concede that, you've given away the game. If this is a drug and they find on one student that you have now conceded can be abused by students and this student says I got it from X, would you think it is possible for school to do less than they can to make sure that X doesn't distribute the same abuse of drugs to other students? In the spectrum of drugs, there's a difference. And I think people need to or the court needs to recognize that prescription ibuprofen is much different than heroin or cocaine or something like that. And if you look at the TLO decision where it's talking about really the intrusiveness, the expectation of privacy. Just to understand my question, when I say abusive, I mean, there are certain drugs that students may have to take for allergies or various things. They're simply not capable of being abused. They're just not the kind of drugs that people take for fun. Right. But what my understanding is from this record, once you've conceded this, that this is the kind of stuff students pop to get a high. No, no, no, no, no. There's a difference between students taking pills that they shouldn't be taking and abusing drugs in that sense versus trying to get some high. You can't get high off of ibuprofen. Well, they're misusing it regardless, right? Right. So isn't that the important point? Why do they take it? I mean, you know, I've thrown all my ibuprofen away. You know, I'm worried about it. But why? I don't know. You know, and Savannah really hadn't. You can buy it right off the shelf, 200 milligrams. Right. Prescription for four. So what does it do for you? You know, they're teenagers doing stupid things. You know, who knows what they were thinking, but Savannah wasn't part of it. What is the drug typically used for by teenage girls? Ibuprofen. As National Association of Social Workers point out, you know, it's something that girls will use for PMS. Well, not for PMS, for cramps. Correct. Hopefully not for PMS. Correct. Well, there are lots of drugs that are useful. I mean, we give morphine to after surgery, and yet that is a drug that's highly capable of abuse. So the fact that ibuprofen, particularly in the lesser strengths, is usable for the legitimate purpose doesn't negate the fact that apparently the information they had is that a bunch of kids that day, I mean, they got this information from the kid that they found. I'm sorry, I forgot the guy's name. Jordan. Jordan. Jordan, thank you. Jordan, who said a bunch of kids are going to pop pills at lunchtime. Now, they weren't going to take it to take care of cramps. I mean, Jordan didn't have cramps, I gather. No, but he was just. He was, when he says they're going to pop a bunch of pills, they're going to do it to try to get some sort of high. I infer. Do you dispute that? Can I ask one other question? You're out of time here, and I know the Chief Judge may call here in a second. I have asked him a question, Judge Smith. Perhaps he could answer my question first. Of course. Well, to answer your question, I don't know why these kids had those or what they thought they were going to do with them. Certainly the school always knew what they were. My question is this. What difference, if any, does it make that the boys were not similarly searched? Because two girls were searched, not the boys. The boys, apparently they were asked to shake their shirts and they were asked to shake their pants. They weren't asked to do anything like the girls were. I don't know. They haven't given any reason for that. In fact, their affidavits, they don't even mention the search of Chris Clark. Right. It was Savannah's. Correct. Okay. Thank you. Okay. We'll hear from the other side. Thank you, Your Honor. Members of the Court, my name is Matthew Wright. I represent the Safford Unified School District and the individuals in this case, defendants Wilson, Romero, and Schwallier. And we would ask you to affirm the lower court's decision, finding that this search was constitutional because, in reality, there were kids in possession of drugs on campus that day and drugs were being distributed that day. And the search — What for? Sir? I guess I have the same question that some of my colleagues have asked. I think Judge Fragers in particular. What exactly were these pills for? Was this some sort of attempt to get some sort of high? I don't know. Presumably. I think this was not a mass headache that was going on in the school. Not at all, Your Honor. Presumably. I don't mean to make it funny. I assume that there was some effort to get some sort of drug high. That's presumed, Your Honor. Why do you presume it? Isn't the reason for the search to deal with something that the school felt was dangerous? Isn't there anything in the record to indicate why they thought it was dangerous? That's exactly why the search was instituted. And the point is — Why? That wasn't my question. Oh, I'm sorry. Why did they think they were dangerous? Because they were prescription-strength drugs and that these administrators are not school- If you get high on 400, you just take two of them. Sure enough, Your Honor. But we don't know, for example, whether any of these students had asthma. And the literature is very clear. If you take prescription-strength ibuprofen and you have asthma, you can go into an attack. The literature is also very clear that if you take ibuprofen and you have a stomach problem, you could bleed out and end up in the hospital. You can look in PDR and look at any drug and you'll get a whole list of adverse reactions. Oh, sure enough. That's why they shouldn't be on school. That's why prescription drugs shouldn't be on school because the administrators aren't medical physicians. They don't know how drugs will interact with students. And what might seem to be innocuous could be lethal. The experience certainly was similar. There was a prescription drug handed out on campus. A student was life-flighted out in ICU, and that's what's in Wilson's mind. You had a young lady here who's an honors student who gets really good grades, who had never been in trouble, never been disciplined. She's 13 years old. And then they go ahead and they give her a strip search. Not a body cap, a strip search. A strip search for strangers. It's pretty humiliating for a young girl. It is. But it's also balanced against the potential dangers. What is the potential danger? Well, that's just the point, Your Honor, that school officials should not be tasked with the responsibility of knowing exactly what could happen if this student took a prescription-strength drug. Had there been students there that took 400 milligrams of ibuprofen? Had there been, Your Honor? Yeah. Unknown. You don't know. We do know that students did take prescription pills before, and one student had a very bad experience. That was two years ago. But relatively recent for Principal Wilson, which is in his mind still. So the principle that you would like this en banc court to adopt, as I understand it, is that a school administrator who believes that kids may be bringing prescription drugs on campus has license upon the suggestion of a co-student to engage in what we're calling a strip search. That is now the clearly established law will be in the Ninth Circuit that so long as the administrator believes it's a pill which can be concealed on the body and on the evidence equivalent to the evidence in this case, it is perfectly reasonable, constitutional for schools to adopt that as a universal law. I don't think that an absolute rule like that, Your Honor. What are the limitations that would say it's not an absolute rule if we affirm it in this case? Yes, Your Honor, the totality of the circumstances in this case. I'm looking at the totality. Do you include then the prior distribution by Savannah of alcohol to students, at least that reasonable suspicion in the principal's mind? What does that have to do with this? Your Honor? What does the alcohol have to do with this? It's also a drug under our policy. But it wasn't in the school. It wasn't anything to do with that, right? It was, Your Honor. It was distributed at a pre-dance party by Savannah. Sponsored by the school? No, Your Honor. But it was eventually brought to school. And what I'd like to finish up on is that group of students included Savannah and Marissa. The smell of alcohol came from that group. And they did find a bottle of alcohol in the girls' bathroom. And that is a drug, and it was on campus. Following up on Judge Fischer's comment, I'd like to bring you back to the second prong of TLO. And I'm just going to read this a little bit because I think you're advocating something here that the Supreme Court did not provide for in TLO. The Supreme Court said, A search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction. Yes, Your Honor. Now, in this particular case, you've got a 13-year-old honor student who's obviously reached puberty. She's wearing a bra. She's at a period that has been pointed out, very, very sensitive for young women. Her body is changing. You have a male vice principal who, based upon, in the case of Savannah, based upon finding, gets a report from somebody who does get caught red-handed. And our jurisprudence in other areas highly discounts people who get caught red-handed and finger somebody else. They look at her backpack. They find nothing. And then they have her undergo a body search, a strip search. Under those circumstances, how can you square that with the second prong of TLO? Three ways, Your Honor. Number one, it is an important governmental interest. It was recognized by the White House in the recent report printed out just January of 2008. Is that a law? No, Your Honor, but it informs the analysis. It informs the analysis to the extent that it shows that prescription drugs are ______. That is right. This took place in 2003. How does the 2008 report ______? Because we already knew that prescription drugs could cause problems before the search. Remember the Life Flight incident where a student handed out prescription drugs. I'm going to hear your second reason. That's what makes this ______. Your second two reasons, and then I need to ask you a question about qualified immunity. Go ahead with my second reasons. Last two. Last two. Because of the importance of the governmental interest in this case, number two, because of the size of the item that they sought to find or to recover, and also because of the way in which the search was administered. So the smaller the item, the more liberty you have to search people's body cavities? Is that what you're saying? If it's drugs and weapons, Your Honor, not body cavities, but a more intrusive search is justified if it's drugs and weapons. What would have limited it? Why couldn't you do what Chief Judge Kaczynski was saying? Why couldn't you have done a body cavity search because it's a really small pill? Because to follow up on that, they have good information that she has it. They don't find it in her backpack. They don't find it in her pockets. They don't find it in her bra. And they say the only place left where it could possibly be would be in one of your body cavities. We're going to start with your mouth. That requires, in my mind, Your Honor, clinical expertise. That, in my mind, would require clinical expertise. Where it doesn't require clinical expertise to simply have. How about this? Suppose the principal says we're taking you to the nurse and we want you to undress and so forth, and she says to Mr. Wilson, with all due respect, you can go take a flying leap. I'm not undressing for you, Mr. Wilson, or anybody else.  No. No, Your Honor. But they could have disciplined her, in your view, for non-cooperation. They could have suspended her for failure to cooperate. I think just to follow up on that. They very well could have. And what did they say? Well, look, we're not going to get clinical, so we're not going to put any, how do I put this delicately, we're not going to intrude physically into your body, but we know that people hide things in their cracks, various parts. So really to make sure that there's nothing there, we want you to, in fact, take your underpants off and bend over so we just make sure that there's nothing hidden there. Okay? It becomes more intrusive at that point. Again, you've got to back up and look at the totality of the circumstances. Well, of course, that's why I'm asking the question. I'm giving you the same circumstances you have here. They have failed to find anything by shaking out the bra and the underpants, and they say, well, we're going to look at the next place you might have them hidden. We're not going to put on the gloves because that requires medical expertise, but we want to at least have a visual inspection of every part of your body that can be seen by. . . In Singleton, they upheld such a search when the authority did touch the student and did pull out the student's underwear to take a look to see if the student had money, not drugs or weapons, but money in his crotch. Crotching isn't part of the parlance of school kids these days to hide things. But in that case, it was a. . . Can I ask a question? How big a town is Safford? Well, it depends. Safford, Thatcher, and the Pima area all together. Just Safford. How big is Safford? Probably maybe 10,000 people, probably 800 kids in the school. This is a junior high school? Yes, sir. Is it the only school in town? Yeah, I believe it's the only junior high in town. The only junior high in town? Except for a charter school. Is this a predominantly LDS community? Yes, Your Honor. Okay. And is there a lot of parental concern about what goes on in school? Yes. Okay. Let me ask you a question about the. . . Why didn't they just call the mother? They could have, Your Honor. That's certainly a hypothetical or reasonable alternative, but the TLO court makes it very clear that because other hypothetical alternatives are available, it doesn't mean that what they did was unreasonable, as long as what they did was. . . Because I understood the danger was, the fear was, was that drugs were going to be distributed during the lunch hour. Yes. Right? That was what the whole. . . The urgency was. The urgency was in the lunch hour. Why didn't they just, you know, keep her in the principal's office during the lunch hour? Well, that might have stopped it then, but what about after lunch? And what about when she goes home? Call the mother. The problem is, Your Honor. . . What is their concern after she goes home? Well, the problem is, is if you don't clear her of those and they take them, then we get sued for not watching the kids close enough and we were fools because we had her in hand and we didn't do anything about it. And that's the catch-22. My goodness. Maybe you should have locked her up. Oh, no. That's. . . You had her in hand. What were you going to do? Well, but we're not. . . The risk to the community. We're not in an adverse scenario with our students. We work with our students. Did you tell. . . Did they tell her at the time, before they conducted the search, did they advise her that she could decline? No, Your Honor. They didn't. I don't believe it's a custody relationship in that sense. They did ask her for her consent to search her backpack. Yes, they did. They didn't ask her. . . She agreed, right? I'm sorry. Answer Judge Hawkins. Your Honor. They did ask her if she would consent to the search of her backpack. They did. Correct. But they didn't ask her consent to conduct. . . That's not in the record. No, Your Honor. Well, they didn't put it in their affidavit. No, they did not. Was her demeanor in any way. . . I mean, you know, this investigative process. . . Right. I'm wondering. . . I understand the school's concern, but at some point to go down this path that you're suggesting, I'm still having trouble seeing the limiting principles. Essentially what you're saying is you can take an honors student out of class where she's, for all we know, had no advance warning on the assumption that when she came to school that day, she had stuffed ibuprofen in her bra or her panties and that when called unexpectedly out of class, she could go into the principal's office and apparently give no sign of deception and yet be tested, pushed all the way to the point of having to go into the nurse's office and expose her private body parts. And that's the rule that will emerge from this case. Well, Your Honor, but in this case, again, under the totality of the circumstances, I would like to comment on this. She was. . . I forgot the word you used. I apologize. You brought up a word that brought into mind something about the way she acted, her demeanor. Her demeanor was evidenced in this sense. She volunteered and admitted that she lent the planner to Marissa, her friend, and that in the planner, the principal knows that there's concealed contraband. So there's a strong association between those two. And in terms of demeanor, there's at least the association and the impression in Mr. Wilson's mind that, look, these two kids are working together to conceal contraband on school, including weapons. And that's a reasonable assumption for him to, in the totality of the circumstances. Contraband including what? Weapons. There were weapons? Yeah, there were weapons. So they were searching her for weapons? No, Your Honor. But what I'm saying is you're talking about her demeanor as a total factor, and I'm saying that that's revealed by the fact that she admits the planner's hers and by the fact that she admits she lent it, voluntarily lent it, to Marissa. She's an aider and abetter of somebody else. That they're working together to conceal contraband on campus. And that factor also justifies going further in this case under the totality of the circumstances. Can I ask you a question, Judge? I'm sorry. Smith, you go ahead. I know you tried earlier. But the record also shows not only that she admitted that she did that, but then she denied the pills. So if one could read the record, she was being a good citizen, saying I did something and I'm willing to admit it, and now I get to the point where you want me to put the pills and I'm telling you the truth again. So that record doesn't necessarily go where you want us to go. Now, my real question is, the second prong of this test, was such a right clearly established? Even if the official is mistaken as to what the law requires, and that's a reasonable mistake, even then the official is okay. Is this record sufficiently established for us to make that determination? Well, under everything that happened in this case, and based on what the status of the law was at the time of the search in the Ninth Circuit, including the McLaughlin case where there was a search in the McLaughlin case without individualized suspicion, I believe that it wasn't, it wouldn't be clear to a public official. Well, I'm not asking you what your opinion about that is. I'm asking you, is there enough evidence in this record? Is the record sufficient? Because the magistrate judge didn't make a ruling on that particular determination. Is this record sufficient, your counsel for the school district, for us to make that determination on this record? I don't need your decision. I just want to know if the record is sufficient. This is the same question I asked your opponent, and the question is, under the second chapter, if you will, of analysis of these cases, we ordinarily would have to decide whether the right she is claiming to be protected by is clearly established. And your opponent says the record is sufficient. What else do we need to know to make that determination? Under the current status of the law, I'm not sure there is anything else to know. So you would agree that the record is sufficient? I would believe that the record is sufficiently clear to show that there was no clearly established right, especially given the McLaughlin case. Okay. Let me ask you about this, because this is a 1987 Circuit decision that's actually I'm sorry. The 1987 Circuit decision, actually the same language is relied upon in Cornfield, and we find it later on in one of the more recent cases as well, that rejects qualified immunity for a nude search of a 13-year-old girl. Is that Renfrew, Your Honor? It's Renfrew. And the Court there says it does not require a constitutional scholar to conclude that a nude search of a 13-year-old child is an invasion of constitutional rights of some magnitude. More than that is a violation of any known principle of human decency. Apart from any constitutional readings and rulings, simple common sense would indicate that the conduct of the school officials in permitting such a nude search was not only unlawful but outrageous under settled, indisputable principles of law, quoting a Supreme Court decision. And Renfrew is completely distinguishable from this case. In Renfrew, they brought dogs on with no specific suspicion that the child, though, as designated in the case, had any history of drug dealing, any association with kids that had drugs, was never reputed to have drugs, and it was a nude search, and this was not a nude search. So there's a reasonable suspicion from this goes to whether the law is clearly established, right? Correct. So why does that make a difference? That case would not inform the principle that what he did in this case was unconstitutional. Are you saying, Mr. Wright, that if you had a daughter who was an honor student in this case and you found out about it that you would not be outraged, is that what you're telling this Court? I would be upset if my daughter went through that. Okay. But what would you have done? Would you march down to the school district and demand to know why this happened? No. I would have also wanted to know more about the case. And when I found out that my daughter was involved, actively involved in helping another student conceal contraband, and if I found out that my daughter had served alcohol at a pre-dance party, and when I found out the association and the strength of the evidence that they had, then I would have dealt with my daughter, as a father should, and as my wife would, work with me to invoke discipline. And if your daughter said that none of that was true, she was never involved in that, of course the affidavit says that your wife in this case was involved as well, and she denied it. So basically you've got this person who has an unblemished record, an honor student, in a little, as Judge Hawkins said, a little LDS town. My mother was born in Thatcher. I know that area. Yeah. And the fact is you have this little teeny community, and you have something that goes on like this where this vice principal had to know. Virtually every kid in the community. How could this happen and have it qualify under the second prong of TLO? Well, Your Honor, remember that she was an honor student, but her record was not unblemished, not in Principal Wilson's mind. She got a B? No. Now, in Safford, that probably would be a problem. But remember that Mr. Wilson has reason to suspect that she served alcohol. Why? Because a reliable informant, Jordan, told him so. Reliable informant Jordan says that Marissa's going to have a pill, and lo and behold, she has the exact pill he says she would have. So she doesn't have an unblemished record. There's more to the mental state of Mr. Wilson. She doesn't have an unblemished record. You've got the testimony of one person. You check the backpack. There's nothing there. You ask her. She said she didn't do it. Again, the Supreme Court says we have to look at the totality of the circumstances. This totality is in a little teeny town. It's not right in the middle of a huge metropolis where nobody knows anybody. It's a little town. Doesn't that factor into our constitutional analysis here? In what sense, Your Honor? In the sense that you know everybody. You know the circumstances. You know the families. Isn't that part of the circumstances here? Well, it would solidify the fact that if Mr. Wilson has the information he has about the pre-dance party where she's supplying alcohol and there's no other evidence but credible evidence to support that notion, especially in a small town, it's never rebutted, it just strengthens his position to suspect that she is involved actively with Marissa. And remember that day they were working together concealing contraband. Either way you look at it, it's Savannah's planter, it's in Marissa's position. What's the planter got to do with it? I don't understand that planter. Because if a student is working together with another student to conceal one type of contraband, it's reasonable for Mr. Wilson to have another. To answer Judge Pregerson's question, what's so significant about the planter? How does it even come into play? It's an association between Marissa and Savannah, and it contains contraband. Where did they find the planter? Next to Marissa when they called her in to search her. Next to Marissa. In the classroom or in the principal's office? No, no, no, in the classroom. It was found in the ñ who found it? Mr. Wilson saw it and asked the teacher to grab it, and that's when the teacher opened it up and showed him the contraband in the planter. So he took it to him with the office. Then later when he questioned Savannah, she admitted that was her planter and that she lent it to Marissa. Did she say why she lent it to Marissa? In the affidavit she says that she lent it to Marissa to help Marissa conceal cigarettes and lighters from her parents. From her parents. From her parents. But it's contraband because cigarettes are banned on campus. Which is in the policy and of record. So a cigarette, which is to be smoked by an individual, you're equating to their ñ therefore they're working together to conceal pills that are distributable to kids across the universe. Oh, I see what you're saying. The important part is that they were working to conceal contraband on campus. Yes. On campus. On campus, in a planter, in a backpack maybe, in pockets. Yes, and weapons. And we're talking about the two important things. There was a knife, Your Honor. There was a knife. And drugs and weapons are the important compelling interests the government has to be sure that kids don't possess. Can I go down a slightly different road with you? Yes, Your Honor. The TLO says that school authorities may search looking for violations of the law or violations of school rules. Those are the two rubrics. I take it this was a school rule case, not a violation of law case. I don't ñ tell me, I mean, which was it? It was definitely a violation of the school rules and perhaps a violation of law. And violation of the law in the sense that having prescription drugs that are not prescribed to you. I think if a kid comes to school carrying his allergy medicine that's prescription, that would not be a violation of the law. It might be a violation of school rules, but it would not be. But this would be a violation of ñ possibly a violation of the law. And the school rules, as I understand it, the policy is at Appellee's Excerpt of Record 4. And as I read the policy, it brands ñ the fact that these were prescription drugs is not dispositive. The policy covers any prescription or over-the-counter drug except those for which permission to use in school has been granted pursuant to board policy. Correct. So bringing a headache tablet to school would be a violation, even if you have a headache, or bringing Midol, that kind of drug if you're a girl who needs something for cramps. That violates the policy unless specific permission has been granted by the school. Is that correct? Right. That's correct. And is that ñ I'm just wondering what the limits of that rule is and how ñ what it would justify. I mean, much has been made by the school that this prescription strikes ibuprofen. But as Judge Thomas points out in his dissent, in the panel dissent, there really was nothing special about the fact that this was prescription. What if these had been just regular old Motrins? Same result, right? Well. It would still be a violation of the school rules. It would still be a ñ oh, yes, it would still be a violation of the school rule. And as Judge Pregson points out, you just have to take twice as many. I don't know that that ñ I don't know that that necessarily is true, Your Honor, because, again, I'm not trained in medicine, and I don't know ñ Suppose it's gum. Suppose they have a policy against bringing gum to school. Yeah, different. It's not drugs or weapons. Drugs or weapons are the epidemic in a great proportion in school. It's a problem. Kids can sneak with these baggy pants. They can sneak weapons on. They can sneak drugs in. And it's those two things that cause problems for schools. Did that happen in this school? Sir? Drugs and weapons in this school? No, I'm saying generally. But there were weapons at this school at the time of the search found in the planner. There was a knife. It's in the record, Your Honor. Yeah, I saw that. Yeah. And Marissa had a razor blade, right? Yes, she had a razor blade as well. Which can be used for all sorts of things. Correct. And prescription drugs have now become the drug of choice among children ages 12 to 13, exactly Marissa's age at the time. Sir? I appreciate the drugs. That's what this case I thought was about. Now you're saying that you're inferring because Savannah admitted to loaning a device that could conceal cigarettes from her parents, and Marissa used it also to conceal what you're now saying is a weapon. Suddenly Savannah is now complicit in a smuggling and concealment scheme to deal with weapons? And that was what was motivating the search? No, Your Honor. So what's the relevance of it? The relevance is it was proof of their association, proof that they're working together. Remember, Jordan says the tip is student gave me a pill and a group are going to take it. You keep throwing in weapons, that weapons are epidemic, that somehow there's a justification. In the totality of the circumstances, when we write this opinion, we're supposed to say not only did Savannah admit to giving her the planner to conceal cigarettes from her parents, but Marissa used it to conceal weapons. Ergo, the search of Savannah, body search of Savannah is justified because there were a razor and a knife in the planner. Does that get into the totality? What guidance are we giving down the road to somebody who's going to apply this opinion? I guess what I was saying, Your Honor, is I was answering the question about to what extent do we go, and I was saying when it comes to drugs and weapons, those are important governmental interests. Well, that may be, but what's the governmental interest in this case? Yeah, now, back to this case. The governmental interest is preventing students from taking prescription drugs. The Supreme Court noted that the court has or the schools have an important governmental interest in preventing students from abusing drugs. I don't dispute that for a minute. Correct. And so the point about the planner is, and I apologize that I'm unclear, is that it provides a nexus that those two are working together. And because Jordan says it. To do something. To do something. To do something. And because they had been together in a group before where they were suspected of using alcohol, which was later fleshed out by Jordan's report, and because Jordan said a group was going to get together, it shows that they are working together. That's what I was trying to say. Thank you. Thank you, Your Honor. The other side's time is up, but if you wish to take a minute for rebuttal, always unwise to do that because you might get questions. But if you wish to take a minute, we'll give it to you. The Doe v. Renfro. One minute. Sure. Not two. There we go. Doe v. Renfro is important. It was decided long ago. It said it doesn't take a constitutional scholar to find these searches unreasonable and unconstitutional. Doe v. Renfro has been cited by this Court numerous times. It was cited in another dog sniff case, the BC v. Plumas case. It was cited more recently in Calabretta v. Floyd. I mean, the school bond notice said before you conduct these kind of searches, these highly intrusive searches, you have to have sufficient evidence. You have to have the nature of the infraction must be great. The quantum of evidence must be great. And only then can you go down that road. Thank you. Okay. Cases are used and submitted. We are adjourned.
judges: Kozinski, Pregerson, Hawkins, Silverman, Wardlaw,fisher,gould,paez, Bea, M Smith, Nr Smith, Cjj